CERTIFIED FIRE PROTECTION, INC., A NEVADA CORPORATION, APPELLANT, v. PRECISION CONSTRUCTION, INC., A NEVADA CORPORATION; ARTHUR WIRTZ FAMILY LIMITED PARTNERSHIP, A FOREIGN LIMITED PARTNERSHIP; AND LIBERTY MUTUAL INSURANCE COMPANY, RESPONDENTS.

No. 54603

CERTIFIED FIRE PROTECTION, INC., A NEVADA CORPORATION, APPELLANT/CROSS-RESPONDENT, v. PRECISION CONSTRUCTION, INC., A NEVADA CORPORATION; ARTHUR WIRTZ FAMILY LIMITED PARTNERSHIP, A FOREIGN LIMITED PARTNERSHIP; AND LIBERTY MUTUAL INSURANCE COMPANY, RESPONDENTS/CROSS-APPELLANTS.

No. 55514

August 9, 2012 283 P.3d 250

*McDonald Carano Wilson LLP* and *David J. Stoft, Anthony D. Guenther*, and *Patrick J. Murch*, Las Vegas, for Appellant/Cross-Respondent.

*Prince & Keating* and *Dennis M. Prince, Bryce B. Buckwalter*, and *Douglas J. Duesman*, Las Vegas, for Respondents/Cross-Appellants.

Before CHERRY, C.J., GIBBONS and PICKERING, JJ.

## OPINION

By the Court, PICKERING, J.:

To recover in quantum meruit, a party must establish legal liability on either an implied-in-fact contract or unjust enrichment basis. Because we agree with the district court that appellant/cross-respondent Certified Fire Protection, Inc. did not provide sufficient

evidence to establish either an implied-in-fact contract or unjust enrichment, we affirm. Additionally, we affirm on cross-appeal the district court's order denying attorney fees.

## I.

Respondent/cross-appellant Precision Construction, Inc., a general contractor pursuing a contract for a warehouse construction project in 2005, solicited bids from subcontractors for the design and installation of an early suppression, fast response sprinkler system.[1] Certified picked up a set of plans detailing the sprinkler system's requirements and, in mid-November, submitted a bid of $480,000. Precision notified Certified that it had won the bid, and Precision entered into a contract with the owner to complete the project.

On December 5, Certified obtained a copy of the subcontract along with a set of construction plans and sprinkler system specifications. The subcontract's provisions required Certified to complete the preliminary design drawings of the sprinkler system within two weeks and to obtain a certificate naming Precision as an additional insured. Over the next few weeks, Precision asked Certified several times to sign the subcontract and provide the additional-insured certificate.

Certified objected to the subcontract as imposing terms that differed from the bid specifications. It complained that the unanticipated terms changed the scope of work—including the size of pipes to be used, the placement of the fire riser, and the two-week time frame for producing drawings—and that it would have to amend its bid accordingly. Certified also took exception to some of the generic contractual provisions, including the additional-insured requirement.

On December 20, Precision notified all subcontractors, including Certified, that construction was under way. Certified hired Ron Dusky to draft the sprinkler system designs and, sometime in mid-January 2006, Dusky began drafting the designs. On January 19, with the subcontract still unsigned, Certified submitted a $33,575 progress bill to Precision, representing that it had completed seven percent of its work. But the design drawings apparently were still unfinished (or at least undelivered) because six days later, Precision wrote Doug Sartain, Certified's owner, requesting the sprinkler plans "ASAP" and advising that Precision would not process the progress payment without a signed subcontract. The next day, January 26, Precision again contacted Sartain, asking

---

[1]Respondents/cross-appellants include Arthur Wirtz Family Limited Partnership (owner of the property) and Liberty Mutual Insurance Company (surety on mechanic's lien release bond). We will refer to respondents/cross-appellants, collectively, as Precision.

whether Certified planned to continue with the project and notifying him that its delay in submitting the plans was delaying the whole project.

On January 27, Certified reiterated its objections to the subcontract but assured Precision that it had begun the fire protection drawings. Certified completed the design work and submitted the sprinkler system drawings on February 1. Precision and Certified communicated several more times about getting the subcontract signed, and, on February 8, Precision learned that the drawings contained errors that needed correcting. It again asked Certified about the unsigned subcontract.

On February 16, Precision terminated its relationship with Certified for refusing to sign the subcontract, for not providing the additional-insured endorsement, and for incorrect designs. At Precision's request, Certified submitted an itemized billing for the work it had performed; its bill reported costs of $25,185.04, which included design work and permit fees for the project. Precision deemed the costs too high and never paid. Certified placed a mechanic's lien on the property and sued to recover for its design-related work. Certified's complaint sought to foreclose the mechanic's lien and damages for unjust enrichment, quantum meruit, and breach of contract.

The case proceeded to a bench trial, where Certified provided documentary evidence and the testimony of Certified owner Doug Sartain, Certified employee Gary Wooldridge, and the deposition testimony of Dusky, who drew the designs. At the close of Certified's case-in-chief, Precision moved for judgment on partial findings pursuant to NRCP 52(c). The district court granted the motion and expunged the mechanic's lien. The district court found that no contract existed, and that Certified's claim for "quantum meruit has not been established based upon the fact that the design materials could not be utilized by [Precision]." For the same reason—failure to show that Precision had benefited from the design drawings—the court concluded that Precision had not been unjustly enriched. After entry of judgment, Precision moved for attorney fees under NRS 17.115 and NRS 108.237, which the district court denied.

On appeal, Certified argues that the district court failed to determine whether a contract for the design-only work existed but concedes that the parties never reached agreement on the full design and installation contract. Certified also asserts error in the district court's conclusion that Precision was neither unjustly enriched nor liable to Certified in quantum meruit because Precision did not benefit from the work performed. On cross-appeal, Preci-

sion argues that the district court abused its discretion in denying Precision's motion for attorney fees.

## II.

NRCP 52(c) allows the district court in a bench trial to enter judgment on partial findings against a party when the party has been fully heard on an issue and judgment cannot be maintained without a favorable finding on that issue. Although Certified argues otherwise, in entering a Rule 52(c) judgment, "[t]he trial judge is not to draw any special inferences in the nonmovant's favor"; "since it is a nonjury trial, the court's task is to weigh the evidence." 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2573.1, at 256-60 (3d ed. 2008) (addressing NRCP 52(c)'s federal cognate, Fed. R. Civ. P. 52(c)); *see* Robert E. Jones et al., *Rutter Group Practice Guide: Federal Civil Trials and Evidence* § 17:92 (2011) ("Because the court acts as the factfinder when ruling on a [motion] for judgment on partial findings, it need *not* consider the evidence in a light favorable to the nonmoving party . . . ."). "Where a question of fact has been determined by the trial court, this court will not reverse unless the judgment is clearly erroneous and not based on substantial evidence." *Kockos v. Bank of Nevada*, 90 Nev. 140, 143, 520 P.2d 1359, 1361 (1974).

In granting Precision's motion for judgment on partial findings, the district court found that "there was no meeting of the minds on the material contractual terms . . . sufficient to form . . . [a] contract," and that the work Certified did could not be used by Precision and thus "conveyed no value" to Precision. It concluded "(1) that Certified Fire's claim of unjust enrichment has not been established based upon the fact that [Precision] did not unjustly retain any money or property because no work performed could be utilized by the replacement fire sprinkler subcontractor; and (2) that Certified Fire's claim for quantum meruit has not been established based upon the fact that the design materials could not be utilized by [Precision]."

Certified argues that the district court "erred by focusing on a contract that Certified Fire is not seeking to enforce." It asserts that the court evaluated whether the full contract—for design and installation work comprising the $480,000 bid—was enforceable. But Certified conceded in the district court that no such contract existed. Instead, Certified maintains it had either an express or implied contract for the design work only, entitling it to damages or recovery in quantum meruit for the design work alone.

## A.

We first address Certified's express contract claim.

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). A meeting of the minds exists when the parties have agreed upon the contract's essential terms. *Roth v. Scott*, 112 Nev. 1078, 1083, 921 P.2d 1262, 1265 (1996). Which terms are essential "depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought." Restatement (Second) of Contracts § 131 cmt. g (1981). "[W]hether a contract exists is [a question] of fact, requiring this court to defer to the district court's findings unless they are clearly erroneous or not based on substantial evidence." *May*, 121 Nev. at 672-73, 119 P.3d at 1257.

Certified argues that the progress bill it sent to Precision established the price term and Precision's urging that Certified get started on the designs established the scope of work for the express design-work-only contract it claims.[2] But the record does not establish that Precision agreed to pay a sum certain for the design-related work. Certified's $33,575 progress bill—which represented seven percent of the whole subcontract—went unpaid, and Precision told Certified it would not make a progress payment until the whole subcontract had been executed. Beyond this, witness testimony established that a party in Precision's position would not execute a contract for only design drawings; such drawings are specifically tailored for the company rendering them and not useful to another installer. Thus, Certified's argument that Precision was parceling out the work—with Certified doing the designs only—makes no sense.

Not only were price and scope of work terms missing from the claimed design-work contract, the parties never agreed to a time for performance. Certified objected to Precision's proposed two-week timeline for producing the design drawings as "not realistic," and the parties never agreed to another time frame. That the time-for-performance term mattered is demonstrated by Precision's repeated prompting of Certified to complete the designs and Certi-

---

[2]To support its theory that the parties entered into an express contract, Certified cites to *Gulf Oil Corp. v. Clark County*, 94 Nev. 116, 575 P.2d 1332 (1978). In that case, we noted that a subcontractor's written bid is an offer, and accepting that bid constitutes acceptance. *Id.* at 118, 575 P.2d at 1333. This line of reasoning might support enforcement of the whole subcontract, but Certified concedes that this contract was never formed.

fied's refusal to bind itself to Precision's desired two-week turn-around. "When essential terms such as these have yet to be agreed upon by the parties, a contract cannot be formed." *See Nevada Power Co. v. Public Util. Comm'n*, 122 Nev. 821, 839-40, 138 P.3d 486, 498-99 (2006).

And while the district court's judgment on partial findings does not reference a design-only contract, the record substantially supports its conclusion that no enforceable contract existed. *Luciano v. Diercks*, 97 Nev. 637, 639, 637 P.2d 1219, 1220 (1981) ("[T]his court will imply findings of fact and conclusions of law so long as the record is clear and will support the judgment.").

### B.

Next, Certified argues that absent an express contract, it should be able to recover under a theory of implied contract, either by quantum meruit or unjust enrichment.

Certified confessedly is confused by quantum meruit and unjust enrichment, noting that "the distinction between the two theories in Nevada is unclear." "One source of confusion is that quantum meruit is a cause of action in two fields: restitution and contract." Candace Saari Kovacic-Fleischer, *Quantum Meruit and the Restatement (Third) of Restitution and Unjust Enrichment*, 27 Rev. Litig. 127, 129 (2007); Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011) (A pleading in quantum meruit, "[f]rom its 17th-century origins to the present day, . . . has been used to state two quite different claims."); *Martin v. Campanaro*, 156 F.2d 127, 130 n.5 (2d Cir. 1946) (addressing the ambiguity of a pleading in quantum meruit).

Quantum meruit historically was one of the common counts— a subspecies of the writ of indebitatus or general assumpsit— available as a remedy at law to enforce implied promises or contracts. 1 Joseph M. Perillo, *Corbin on Contracts* § 1.18(b), at 53 (rev. ed. 1993); 7 C.J.S. *Action of Assumpsit* § 2 (2004). A party who pleaded quantum meruit sought recovery of the reasonable value, or "as much as he has deserved," *Black's Law Dictionary* 1361 (9th ed. 2009) (defining quantum meruit), for services rendered.

Thus, quantum meruit's first application is in actions based upon contracts implied-in-fact. A contract implied-in-fact must be "manifested by conduct," *Smith v. Recrion Corp.*, 91 Nev. 666, 668, 541 P.2d 663, 664 (1975); *Hay v. Hay*, 100 Nev. 196, 198, 678 P.2d 672, 674 (1984); it "is a true contract that arises from the tacit agreement of the parties." Perillo, *supra*, § 1.20, at 64. To find a contract implied-in-fact, the fact-finder must conclude that

the parties intended to contract and promises were exchanged, the general obligations for which must be sufficiently clear. It is at that point that a party may invoke quantum meruit as a gap-filler to supply the absent term. *See* Kovacic-Fleischer, *supra*, at 129-30; 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.2(3) (2d ed. 1993) (quantum meruit fills price term when it is appropriate to imply the parties agreed to a reasonable price). Where such a contract exists, then, quantum meruit ensures the laborer receives the reasonable value, usually market price, for his services. Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011); *see Sack v. Tomlin*, 110 Nev. 204, 208, 871 P.2d 298, 302 (1994) ("The doctrine of quantum meruit generally applies to an action . . . involving work and labor performed which is founded on a[n] oral promise [or other circumstances] on the part of the defendant to pay the plaintiff as much as the plaintiff reasonably deserves for his labor in the absence of an agreed upon amount."); *see also Paffhausen v. Balano*, 708 A.2d 269, 271 (Me. 1998) (discussing quantum meruit as a contract implied-in-fact).

Certified maintains that it had an implied contract with Precision for the design-related work. As discussed above, however, substantial evidence supports the district court's finding that there was no contract, express or implied, for the design work standing alone. There are simply too many gaps to fill in the asserted contract for quantum meruit to take hold. Precision never agreed to a contract for only design-related work, the parties never agreed to a price for that work, and they disputed the time of performance. When Precision selected Certified, it did so on the basis that Certified would design *and install* the fire suppression system, not that it would draft the designs and leave installation to someone else. The evidence established that design drawings are installer-specific and so not useful to a replacement subcontractor. Accordingly, the district court properly denied recovery in quantum meruit for an implied-in-fact contract.

Quantum meruit's other role is in providing restitution for unjust enrichment: "Liability in restitution for the market value of goods or services is the remedy traditionally known as quantum meruit." Restatement (Third) of Restitution and Unjust Enrichment § 49 cmt. f (2011); *id.* § 31 cmt. e (2011) (quantum meruit's secondary use is as a pleading in the common law in cases "regarded in modern law as instances of unjust enrichment rather than contract"); *Ewing v. Sargent*, 87 Nev. 74, 79-80, 482 P.2d 819, 822-23 (1971) (discussing recovery in quantum meruit to prevent unjust enrichment). " 'Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff

the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in *quantum meruit*.'" *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (quoting *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001)).

When a plaintiff seeks "as much as he . . . deserve[s]" based on a theory of restitution (as opposed to implied-in-fact contract), he must establish each element of unjust enrichment. *Black's Law Dictionary* 1361 (9th ed. 2009); *see* Restatement (Third) of Restitution and Unjust Enrichment § 49(3)(c) & cmt. f (2011) ("[T]he market value of . . . services is the *remedy* traditionally known as quantum meruit." (emphasis added)); Doug Rendleman, *Quantum Meruit for the Subcontractor: Has Restitution Jumped Off Dawson's Dock?*, 79 Tex. L. Rev. 2055, 2073 (2001) ("A defendant's unjust enrichment is the major prerequisite for a plaintiff's quantum meruit."). Quantum meruit, then, is "the usual measurement of enrichment in cases where nonreturnable benefits have been furnished at the defendant's request, but where the parties made no enforceable agreement as to price."[3] Restatement (Third) of Restitution and Unjust Enrichment § 49 cmt. f (2011).

Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is "'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Unionamerica Mtg. v. McDonald*, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981) (quoting *Dass v. Epplen*, 424 P.2d 779, 780 (Colo. 1967)). Thus— contrary to Certified's argument—a pleading of quantum meruit for unjust enrichment does not discharge the plaintiff's obligation to demonstrate that the defendant received a benefit from services provided. Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011); 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.2(3) (2d ed. 1993) (plaintiff pursuing quantum meruit under unjust enrichment theory must show benefit to defendant); 26 Richard A. Lord, *Williston on Contracts* § 68:1, at 24 (4th ed. 2003) (quantum meruit to avoid unjust enrichment applies "when a party confers a benefit with a reasonable expectation of payment"); *EPIC v. Salt Lake County*, 167 P.3d 1080, 1086 (Utah

---

[3]The actual value of recovery in such cases is "usually the lesser of (i) market value and (ii) a price the defendant has expressed a willingness to pay." Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011). Of course, quantum meruit is not the only measure of damages available in restitution. *See id.* § 49 (enunciating measures of enrichment and circumstances when each applies).

2007) (first element of quantum meruit is showing a benefit has been conferred).

"[B]enefit" in the unjust enrichment context can include "services beneficial to or at the request of the other," "denotes any form of advantage," and is not confined to retention of money or property. *See* Restatement of Restitution § 1 cmt. b (1937); *see also Topaz Mutual Co. v. Marsh*, 108 Nev. 845, 856, 839 P.2d 606, 613 (1992) (citing § 1, cmt. b and noting that postponing foreclosure on a property benefits owner by providing additional time to negotiate a sale and reducing overall debt). But while "[r]estitution may strip a wrongdoer of all profits gained in a transaction with [a] claimant . . . principles of unjust enrichment will not support the imposition of a liability that leaves an innocent recipient worse off . . . than if the transaction with the claimant had never taken place." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d (2011); *cf. Heartland Health Systems v. Chamberlin*, 871 S.W.2d 8, 11 (Mo. Ct. App. 1993) (quantum meruit available for provision of emergency medical services).

That is the state of our law, too. In *Thompson v. Herrmann*, 91 Nev. 63, 68, 530 P.2d 1183, 1186 (1975), this court concluded that "[t]he basis of recovery on quantum meruit . . . is that a party has received from another a benefit which is unjust for him to retain without paying for it." In that case, the defendant was to build a dam for the plaintiffs but the defendant's preliminary work failed to meet state regulations and thus was rendered useless. *Id.* at 64-67, 530 P.2d at 1183-85. Because the plaintiffs were required to hire a new laborer to completely rebuild the dam to code, this court held that the defendant could not recover on his counterclaim under a theory of quantum meruit because he had provided no benefit to the plaintiffs, *i.e.*, while he began the work the plaintiffs requested, he ultimately provided no advantage to them. *Id.* at 68, 530 P.2d at 1186.

Here, the district court found that Precision had not "unjustly retain[ed] any money or property because no work performed could be utilized by the replacement fire sprinkler subcontractor," and that included the sprinkler designs. Every one of Certified's witnesses admitted as much on cross-examination. Thus, Certified's owner, Doug Sartain, testified that Certified installed nothing at the job site and its preparatory work could not be utilized by the replacement subcontractor. Gary Wooldridge, Certified's project manager, confirmed Sartain's statements that the design work and permitting performed by Certified could not be used by their replacement subcontractor (though he did say the water flow test could have been utilized). Finally, Ron Dusky, the man who

drafted the plans, stated in his deposition (which was read into the record) that the designs Certified submitted contained mistakes that would have required one to two weeks to remedy. This was never done. Certified submitted no evidence of an ascertainable advantage Precision drew from the work it performed. It was incomplete, incorrect, and late. Therefore, we agree with the district court that Certified cannot recover in quantum meruit or unjust enrichment.

## III.

On cross-appeal, Precision argues that the district court abused its discretion by failing to award attorney fees based on the $7,501.00 offer of judgment it made shortly after filing its answer. Specifically, Precision argues that the court did not adequately address the factors established by *Beattie v. Thomas*, 99 Nev. 579, 588-89, 668 P.2d 268, 274 (1983), in assessing motions for attorney fees under NRS 17.115 and NRCP 68. Precision also faults the district court for not granting fees pursuant to the mechanic's lien statute, NRS 108.237.

The district court did not abuse its discretion. It determined that the offer of judgment was "unreasonable in amount" and made so early in litigation that Certified had not yet had a fair opportunity to assess its claim through discovery. Although Precision argues otherwise, there is no bright-line rule that qualifies an offer of judgment as per se reasonable in amount; instead, the district court is vested with discretion to consider the adequacy of the offer and the propriety of granting attorney fees. *State Drywall v. Rhodes Design & Dev.*, 122 Nev. 111, 119 n.18, 127 P.3d 1082, 1088 n.18 (2006). Nor are explicit findings on every *Beattie* factor required for the district court to adequately exercise its discretion. *See id.*; *Wynn v. Smith*, 117 Nev. 6, 13, 16 P.3d 424, 428 (2001) ("Although explicit findings with respect to these factors are preferred, the district court's failure to make explicit findings is not a per se abuse of discretion.").

Likewise, the district court did not abuse its discretion by denying Precision's request for attorney fees under the mechanic's lien statute. *See* NRS 108.237(3) ("If the lien claim is not upheld, the court *may* award costs and reasonable attorney's fees to the owner or other person defending against the lien claim if the court finds that the notice of lien was pursued by the lien claimant without a reasonable basis in law or fact." (emphasis added)); *Barney v. Mt. Rose Heating & Air*, 124 Nev. 821, 827, 192 P.3d 730, 734 (2008) (district court has discretion pursuant to NRS 108.237). While the district court did not make an express reasonable-basis finding, the

384

record fills the gaps, *Luciano*, 97 Nev. at 639, 637 P.2d at 1220 (this court may imply factual findings so long as they are clear from the record), and Certified had a reasonable basis, *Rodriguez v. Primadonna Company*, 125 Nev. 578, 588-89, 216 P.3d 793, 800-01 (2009) (party's claim may be reasonable despite losing), to pursue the lien.[4]

Accordingly, we affirm.

CHERRY, C.J., and GIBBONS, J., concur.

[4]Certified does not argue the district court's award of costs was improper. Therefore, we affirm that order.